Case 22-5491, BNA Associates LLC v. Goldman Sachs Splty Lending Group, L.P. Oral Argument, 15 minutes per side. Mr. Krogh for the appellate. Good afternoon. May it please the court. My name is Paul Krogh. With my partner Eric Smith at counsel table, I represent BNA Associates LLC. With the court's permission, I will reserve four minutes for rebuttal. The district court dismissed BNA's intentional interference claim on the basis of the dealer's privilege. But because the amended complaint doesn't implicate the dealer's privilege, the district court erred and should be reversed. And with my time this afternoon, I'd like to focus on two points in addition to answering the court's questions. And those are, one, why the dealer's privilege doesn't apply, and two, why apart from that privilege, the district, the amended complaint, plausibly alleges improper means. The disputed element of the intentional interference claim. The dealer's privilege applied in Tennessee comes from restatement of torts, section 762, and it protects parties from being forced to continue or enter into business relationships against their will. You can't be forced under threat of tort liability to buy from, sell to, or contract with another when that's the only basis for the claim against you. Before you get into that, how can you state an intentional interference claim when there is an underlying contract? Certainly, Your Honor. And the reason is that this was a terminable contract, or a contract to buy property where one party can terminate, more or less, here, I tend to use the words at will, but also a determinable contract. The interest isn't in that contract. The real interest is the ability to consummate it and get the further transaction of buying the property. And so numerous courts, I think the most in-depth analysis is the Ixchel case out of California's Supreme Court. They've said that when you've got a contract like that that's terminable, it's governed by the same rules as a pure business expectancy. Do you think that this is terminable in the way that they mean? An at-will contract, employment obviously, if there's no employment contract, then either side, somebody can be fired or they can quit without any conditions. This was a little different. Isn't it a binding contract except for the fact that there was a condition on performance and the condition wasn't satisfied? So why would the at-will case law apply to this different type of contract where it was binding and it just had a condition on it that didn't end up getting fulfilled? I think the same analysis applies. Your Honor's analysis of the distinction is correct and factually correct. We do have, it wasn't purely at-will. It was subject to this condition and there was a right to terminate based on that condition. But when we look at it, we have the same interests at stake. It's not absolute. What I really want is I really want the further deal. I really want the closing to happen. I'm not so much concerned about the contract that I have. And there are cases even out of Tennessee that have applied this same analysis, applied the same type of claim to these sorts of contracts and we cite the Clearwater case out of Tennessee Court of Appeals that addressed a very similar situation. The plaintiff there had options to purchase and contracts, contingent contracts obviously, to resell and its efforts to make all that happen were impeded by a public relations campaign that involved dishonest tactics. And the Court of Appeals in Tennessee said we think that this really is governed by the claim for tortious interference with prospective business relations. It wouldn't be fair to apply the inducement to breach claim, but it also wouldn't be fair to leave the parties that have that business expectancy with no recovery at all. Why didn't you just bring the two and the alternative? Intentional interference with contract in addition to. So you could say that they interfered with the contract would have been the conditions contract. And we didn't do that because in Tennessee the essential element of that claim is an actual breach. And so if you reduce your claim to a definitive contract and what you really care about is that contract and not a further contract that it anticipates, then the other party lawfully terminates it. You can't come in and say you were induced to breach because you weren't. And that's the reason we didn't bring that claim, Your Honor. Every real estate contract has sort of conditions precedent or contingencies. And this struck me as just another variation of that, right? I mean, we have an agreement to sell a home. That's what I would know best because that's the biggest transaction I've done, but there's all kinds of contingencies and things like that. Sometimes those get honored, sometimes they don't. Why is this any different? Why is this a different kind of contract? I think from between BNA and Ruby Tuesday, it is exactly like that. The condition didn't happen and so there's no liability between those two parties. But when you go to buy your house, if you had gone and the other side, the seller had asked for a payoff number from his bank, and the bank had said, no, we like that house, we're not going to give you one. Would that be fair or unfair? Would that be something that happens in the ordinary course that we would expect to have to deal with? Or is that something that we would look at and say, that's not right? And respectfully, we submit that that's something that you would look at and say, that's not right. And it's not something that happens in the ordinary course. It's not something that the parties, that's not the kind of contingency that, how that's supposed to play out. It's not how people anticipate. And that's what separate... That's a business relations claim, not a contract, interference with contract claim? It's interference with the, right, the expectancy of being able to close the deal. Because if the bank won't give the... It sounds like a contract claim and it sounds very similar to the case we have in front of us. You're trying to move us away from the inducement to breach contract or the contract based claim and move us into the business relations claim. But it strikes me that just because there's a contract in that, in that scenario, there's a contract in this scenario. Certainly. They would both be contingent real estate contracts. And the greater weight of authority supports treating those as business relations cases. So can I ask just a... Why? If I was a bank that had a mortgage or a security interest, whatever you want to call it, in a property, and then the debtor came to me and said, can I convert this asset that I have, that you have the first dibs on, to cash, I would be concerned that the debtor, who's already in financial trouble, would kind of, you know, waste that cash. And there goes the thing that I have a security interest in. So why... What was the idea here? Was the bank going to get all the money from the sale? We certainly believe they were, Your Honor. And I believe we allege in paragraph 34 of the complaint that Goldman would have received full value. We were going to pay more than they had agreed separately the property was worth. And the court presumes that people follow the Goldman's interest would have been protected. And I mean, there is a... It was essentially, it was Goldman selling you the property in some respects then, right? After getting all the proceeds. I don't think that's functionally or formally how people think about... If I had a security interest and I was a bank, I would want to make sure that I was guaranteed on the value that came out of it on the back end. Correct, Your Honor. I certainly wouldn't give it to the debtor who's already in financial trouble without basically having a security interest in the funds. And it seems to me it's somewhat more difficult to get a security interest in money. So unless you just give the bank the money, then okay, I could see that. Certainly Goldman would have had an interest in the structure of the closing. And I think it would have been an interest that maybe they could have done something to protect. And it might have implicated restatement section 769, which we think is the proper lens for analyzing this, as opposed to this dealer's privilege, which is this absolute privilege that really deals with the parties to a relationship themselves. 769 goes directly to what Your Honor is... But if they had this whole value of the property, they were kind of the party to the relationship in some respects. Their mortgage or whatever you want to call it, because the party was so indebted, was for the entire amount. It was. And so they certainly had... They were the ultimate economic beneficiary. But we never dealt with them. We weren't asking them to like us or deal with us. When Judge Radler goes to buy a house, he's not saying, I hope the seller's lender likes me well enough to sign this contract with me. Even though maybe the house is... It's different though. It's not just the lender. I suppose the seller's lender had a mortgage for the entire amount of the property. Correct, Your Honor. So 769 is the obligation to negotiate freely or interact in good faith with potential business partners or... Well, we... Go ahead. I mean, you keep... I'm just trying to refresh my memory about what that's... 769 provides a qualified privilege for parties that have a financial interest in another's business to interfere with transactions. So if... And we cited... In case my time has expired. No, go ahead. We cited a number of cases where, for instance, banks kibosh transactions that would be loan assumptions because they didn't like the creditworthiness of the buyer, because then it would be the person... Maybe that person wouldn't repay us. Yeah, I mean, they used to interfere, but they had this contractual right where they had to approve Ruby Tuesday's lease of the property. And they just didn't... They didn't grant... They had this contractual right to say yes or no, and they said no. And whatever you want... Whatever you want to look at in the restatement or the dealer privilege, I'm really struggling with why that creates liability for Goldman by simply invoking a contractual right that they have. Goldman had a contractual right with Ruby Tuesday's, and I think there are two things about that. One, we don't have a 1236 record here to say whether or not they even invoked that right properly. There's a lot out there in that relationship that we don't know about on this record. What do you mean by invoked properly? Well, I mean, it is possible, for instance, under Tennessee law especially, to violate the duty of good faith and fair dealing by refusing to consent to a transaction that you've got that right with respect to. So that could have happened here. I'm not... But you don't... Don't we have to take your allegations? Do you allege a breach of contract as the underlying basis? We don't, Your Honor. So that's kind of... I don't think we could rely on that as the basis, could we? Well, I don't think we could rely on the breach to say it's not there, and I don't think we could rely on the proper performance to say it isn't. What's your theory of... The problem I have with this tort overall is it seems quite vague and... Vague rules increase transaction costs on parties, and we should be working to minimize those costs. And so I worry about this tort and courts coming in after the fact and saying, let's do what's just when we have no idea what just is and it's in the eye of the beholder. So how can you assuage me that what you're asking for is just not us second-guessing with some type of vague unfairness idea, which I don't think this tort was designed to be about. It was more about some type of violation of law or some type of other more tangible egregious conduct. Well, Your Honor, the cases say that... I mean, it is. It is a somewhat vague claim. The elements are somewhat vague, and this impropriety element especially, the cases say things like the measure is the conscience of the community or the behavior of fair men... I mean, every business transaction has to be judged against the conscience of the community by a federal court? Well, it's ultimately an issue of fact, Your Honor. And so what we're really asking is... Okay, by a jury or by the judge, then it comes up to us? I just don't... Building on Judge Murphy's question, going back to my earlier one, how can invoking a contractual right ever rise to the level of the tort that you're talking about? Of course. Because it's assumed that it was properly invoked. Well, you just discussed that with Judge Murphy. Right. Say we don't agree with you on that. It's a contract between Goldman and B&A. If I sign a contract to fight in a prize fight, right? I have a contractual right to punch the other guy, the other boxer. I don't have a contractual right to punch spectators. And B&A is a spectator here. We don't have a contract. I mean, that's a really odd way to look at it. It was just a contract between Ruby Tuesday and Goldman, and Goldman says, no, you can't sell the property. I don't care whether it's B&A or whether it's whoever it is. You just can't do it. Is there some allegation of animus towards B&A that drove this? No. No. There's not... We don't have an allegation of that, Your Honor. We don't have an improper motive. So why, again, why can't they just invoke their contractual right to the company that they've loaned $100 million to plus to say you can't lease that property? Because I'm not aware of and haven't been cited to any legal authority for the principle that if A and B sign a contract, anything that qualifies as performance or invocation of the rights under those contracts can't be a tort. How about that it is a tort? How about not that it can't be? How about that it is? You just proved a bunch of negatives, but you're a positive case to come forward. I'm still not. I don't know. I'm taking all your time. But any last answer? Simply to say that if we otherwise meet the elements, it doesn't make any sense why somebody else's agreement should defeat what otherwise would be the elements of the claim. Okay. Okay. Thank you very much. May it please the Court, my name is David Fine. I represent the Appellee Goldman Sachs Specialty Lending Group. And with my partner, Jason Callen, we ask the Court to affirm I'd like to pick up where Judge Radler and Judge Murphy left off, which is Goldman Sachs had a contract with Ruby Tuesday. And the contract said you cannot sell or dispose of property. That cannot turn into a tort. My opponent is asking this Court to be the first to declare that that could be. And there's no reason to do it. Judge Murphy, you were alluding to the idea that it would create a very sort of murky standard that would create a lot of inefficiencies. And that's exactly right. And that's the concern that the Tennessee Supreme Court had in the Troubad case 20 years ago when it agreed to bring in this tort. It said, well, we're going to do it, but we're doing it grudgingly because we don't want it to interfere with legitimate competition and legitimate business. And that's why when it offered that list, that illustrative list, of the kinds of things that could constitute improper means, they were all things, as Judge Murphy was pointing out, that are defamation, misrepresentation, breach of fiduciary duty, duress. So I did think there may be something to the idea that these types of contracts clauses, I usually do think courts will impose a duty of good faith or whatever that idea is, fair dealing. So it's not just like you can exercise your right for any reason. There might be a reasonableness prong implied in that. And if that was breached, could that form the basis of a tort by BNA? No, Your Honor, it can't. And here's why. This credit agreement was governed by New York law. And we offer authority in our appellee's brief from the New York courts, from the Southern District of New York, that New York says that in just that circumstance, the lender can reject a request to assign property for any reason or no reason. In other words, there's no implied duty in that setting. So Ruby Tuesday could not have claimed an implied duty in that setting. And it would be a bizarre twist of the law to say that somehow a third party to the contract, BNA, has greater rights than the actual party to the contract. What about the bankruptcy aspect of this case? So there's kind of an odd wrinkle because Goldman may have known that, probably had information about whether Ruby Tuesday was solvent and whether it would be filed for bankruptcy. And it could be the case that Goldman thought we'll help put the company into bankruptcy and then we'll buy the asset for a lower price ourselves. Judge Redler, the first answer I'd give to that is that there's no allegation along those lines in the first amended complaint. The second is that even if there were, that would not satisfy the element of the tort. Remember, we're looking for improper means, not improper motive. My colleague across the aisle has conceded that they cannot state a claim for improper motive. That would be an improper motive. It's not true, by the way. Bankruptcy proceeding could be the means. Well, except that the bankruptcy proceeding was initiated by Ruby Tuesday, not by us. But you would have had a good sense of their financial position. You could have looked down the road and saw that was inevitable. Only the BNA could not. And, Your Honor, even in that circumstance, let's assume all of those things and set aside all of my reservations. It still would not be improper means for purposes of the tort. Because what caused the inability to close on the RT Lodge was that RTI was precluded from doing so by the credit agreement. And Goldman Sachs simply exercised its right to stand on its rights under the contract. So whatever else might have happened did not cause that failure to sell the property. The failure for BNA to buy, not the property, but the leasehold, was the contract provision in the credit agreement. And as Your Honors have pointed out, that in itself cannot, as a matter of law, be improper means, at least as trial med. What do you, does the fact that it's 12B6 matter? So your New York case law might say that. But I thought there was an allegation in the complaint that it was standard in the relevant business community or something to that effect. And this was like kind of following the footnote in the Tennessee Supreme Court case that suggested that a breach of kind of commercial norms in the relevant industry, even if it wasn't a contract, could be enough to be improper. How would you respond to the allegation in the complaint combined with that footnote? Well, Your Honor, I think if you look at trial med and that illustrative list, and I realize it's not complete, but it was intended to be illustrative. Items in a list should be understood in the context of the company they keep. And in that list, as Your Honor pointed out, Judge Murphy, what they're talking about are defamation, duress, misrepresentation, breach of fiduciary duty. So we're not simply talking about, well, another lender might have allowed this, or even a whole lot of other lenders, or even most other lenders. But don't they say something to the effect of a violation of a trade practice in the relevant community? And if they allege that it's standard practice for lenders to agree to this when its exchange of value is proper, why wouldn't that be enough? It's not enough, Your Honor, because that stretches the notion of a violation of a trade norm to the point of simply allowing a collateral attack on a contractor. What's your view of what the trade norm, what that language means? That language means things like ethical violations, things along those lines. Not every other lender does this, notwithstanding, by the way, that they have a contract. And that's another reason, by the way, why that allegation is not a plausible allegation. I was curious, do you view that as a legal allegation, a legal conclusion, or is it a factual conclusion that we have to accept? I would submit neither, respectfully, Your Honor, neither, because it attempts to be a factual allegation. But it's a factual allegation that's conclusory in almost all respects, which we know from Twombly and Iqbal you cannot do and survive. It's got to be a plausible allegation. Beyond that, even if it were true, it cannot surmount the fact that there was a contract right in Goldman Sachs. Goldman Sachs had the right to simply stand on its contract that said that RTI could not dispose of or sell any of its assets. And as Your Honors, I'm sure, will appreciate, that's a completely reasonable thing that lenders put in all the time. They want protection. And in this circumstance, I think, Judge Murphy, you were the one who pointed it out, as it became clearer and clearer that Ruby Tuesday was having financial distress, in fact, it had financial distress and that's why it got the credit agreement, it makes all the more sense for... What's your response? I guess there's an allegation in the complaint that suggested you would get all the money. Well, no, there isn't. It's a little cagey in that regard. What it says is it would be the full value of what the RTI Lodge... Yeah, so it could be value in the form of money that could be easily dispersed. But there's no allegation that we would get it. That money, and I think Your Honor questioned my friend across the aisle about this, that money would have gone to Ruby Tuesday. What would happen to it from that point forward, we don't know. It's a company in distress. It's a company on the pre-sea of bankruptcy. And, of course, once you go into bankruptcy, all bets are off about what creditors will or will not get. And so, no, there is no allegation to that point. So I guess the concern would be, unless you're guaranteed that money, you just become an unsecured creditor from funds, so all you're doing is switching from a secured mortgage creditor to an unsecured creditor. I think that's absolutely right, Your Honor. And I'd add in, by the way, as well, and this is in an attachment to the complaint, so it's fairly before the court, that the amount of the debt from Ruby Tuesday to Goldman Sachs was upwards of $37 million. This was not the total debt. So there's nothing in the law that says that somehow you get to sort of pick off pieces of collateral and say, well, if you get enough, you have to allow us to sell it. Especially when you don't allege and can't allege that the money would flow to the lender. Is there any limitation on the contractual right that you had to object to any potential transfer of the property? Is there any limitation? Let me push back just a bit, if I might, Your Honor, on the question. Because it wasn't an objection. Because the credit agreement itself... How do you want to phrase it? It was a flat right. It was a flat prohibition. There was no consent provision, nothing. And so the answer is, no, there really isn't a limit. So they could deny consent for any reason. Exactly. And especially since this was a contract under... Religious animus. They could resist it based on religious animus. They probably could, Your Honor, because it's a private party dealing with another private party. And under New York law, as I cited, and it's referred to in our brief before this court, the Southern District of New York case, they could deny consent for any reason or no reason at all. That's New York law, which RTI and Goldman Sachs agreed to. If we thought this case was really an inducement of a breach of contract rather than business opportunity, could we remand to allow the plaintiffs to plead that sort of claim? Remand without prejudice to allow that claim to be brought forward? I would submit no. And I know this goes back to one of the first areas of inquiry Your Honors raised with my opponent. They had the opportunity to plead not once but twice. They chose the field of battle, if you will. And they knew that we had made this argument before. So they had an opportunity to cure this if they thought they could. And they decided that they couldn't. And I would note, by the way, as well, that it would be a futile amendment. Because let's suppose that the court remanded this to the district court and allowed that amendment with instructions to allow that amendment. Well, an element of a tortious interference of contract claim is that you acted with improper motives, improper means, all of the same sorts of things. And so if they can't survive that in this posture, they're not going to be able to survive that even if they brought what we'll sort of charitably refer to as the right claim. And I think that Your Honor... What do you make of the argument that the law barring these types of claims when there's a contract wouldn't apply when there's an anticipated contract with a third party? So I assume what the anticipated contract was not between BNA and Ruby Tuesday, but between BNA and the college. And so there was an anticipate because it would be essentially an assumption of the lease. And so BNA would eventually have a contract with Marysville, which is the actual owner of the property. That would suggest, I mean, that is a relationship that was ruined. That's distinct from the contracting parties. Well, it wasn't pleaded that way. So that's one problem. Forfeiture, I suppose. Well, I think it is forfeiture. And I don't want to spend a great deal of the Court's time on forfeiture issues, but there are some fairly significant ones here. Because as we noted in our brief, we raised the dealer's privilege in our motion to dismiss, clearly. Our opponents ignored it in their response, which means that they did not raise the, this was really improper means. They did not raise the, well, there is this other section of the restatement. Aside from forfeiture, is there a legal response for why the contract would still bar that type of claim? What I mean is the claim of you interfered with my relationship with the party that I was hoping to contract with by interfering with my contract. That might be, had it been pleaded, that might be a claim, except that it would fail because it can't meet the element of improper means, Your Honor. And, you know, I think it's noteworthy to sort of come back and take a step back. If this Court were to recognize the tort of Torsh's interference with business relations for declining to agree to amend a contract, to withdraw a contract right, the effects, not only in this case, but much more broadly, would be dramatic. Because lenders who, as Your Honors, I'm sure, know from your time as lawyers, from your time as judges, always put in provisions like this. They need to. It's a protective provision. Judge Murphy, you pointed that out when my opponent was standing at the lectern. We would be saying that they would have to worry that simply standing on that protective contract right would subject them to tort liability to third parties in any circumstance. And that can't be the law. It would be an expansion of the tort beyond anything any court has ever found. And my opponent has yet to point to any case in Tennessee or elsewhere in which a court has recognized that tort when there is a contract right at issue. And as a practical matter, back to Judge Murphy's point, the effect of that would be that it would drive up transaction costs because lenders would never know when they might be subject to collateral attack from folks like BNA. So unless there are other questions from the panel that I would be very pleased to respond to, we'll ask simply that the court affirm the determination of Judge Crenshaw at the district court. Thank you, counsel. Time for rebuttal. Yes, Your Honor. Your Honor, BNA cites in its briefs two cases, not from Tennessee, but two cases in which a lender's refusal to consent to a collateral sale when it had the right to refuse to consent was deemed improper. Those are the Mitchell case from Virginia where the court there assumed that an agent who interfered with a sale was exercising his principles, the bank's right to consent or not consent to the sales of collateralized cows. And we cite the Esplendido case from Arizona, 1989, the Arizona Supreme Court, where the Arizona Supreme Court upheld this tort against a lender who refused to consent to a collateral sale even though it was receiving full payment. And we do allege a trade practice, and a trade practice is sufficient because the tort reaches sharp dealing and it reaches unfair practices. And we have other cases where defendants have used their position to unfairly kibosh kill one transaction and arrogate the benefit to themselves. The Duggan case out of Virginia, and also out of Virginia more recently, where the seller's attorney used his position there to engage in misrepresentations and maneuvered to get the property for himself. And the Cummings case. That wasn't a case where a party exercised a contractual provision or just followed a contractual provision.  It does have unfair use of a position that the participants expect the person to be involved in some other way. Didn't the agreement say you have to get, this is all subject to getting permission from gold? Our Purchase and Sale Agreement does have, it's the very last paragraph. It wasn't even a surprise. It was well understood by the parties. It was well understood that they had to consent. It was suggested they might not consent. The parties seemed to understand that they may or may not agree to it. And if they don't, then we can go out separate ways. There was always that risk, which is why we, why BNA made sure to offer what it understood to be the full amount of the value of this lease. Judge Murphy, you asked about transaction costs on business deals where we have these sorts of concerns. And BNA obviously is a business. It cares about those issues. And something that raises transaction costs and creates uncertainty for businessmen trying to do deals is unexpected interference from outside parties like lenders. Everybody knows that lenders have legitimate interests and deserve to be repaid and can expect to be repaid. But when you've got a situation where the lender is being promised full repayment, it's not normal and it's unexpected  to take the opportunity for themselves. And Judge Murphy, I think you asked about the bankruptcy. Goldman knew that bankruptcy was coming. There was that restructuring agreement in the record. They basically set up a prepackaged 11 for Ruby Tuesdays. So this was not something unexpected from their perspective. And it wasn't just that they knew how much money Ruby Tuesdays had. Respectfully, we submit that the Court should reverse and allow a tenancy jury to assess the situation. If the Court has any other questions. I think that's it. Oral argument imposes some transaction costs too, but we appreciate you all incurring those. Very nice to have you, and the case will be submitted. Thank you, Your Honors.